**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000670
27-JUN-2022
07:58 AM
Dkt. 85 MO**

NO. CAAP-19-0000670

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
RUBIN IKOA CASUGAY BADIANG, also known as
RUBIN CASUGAY, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 1CPC-18-0002010)

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Rubin Ikoa Casugay Badiang, aka
Rubin Casugay (**Badiang**), appeals from the "Judgment of Conviction
and Sentence" filed on September 9, 2019, by the Circuit Court of
the First Circuit (**Circuit Court**).[1]  On June 25, 2019, after a
three-day jury trial, the jury convicted Badiang of Robbery in
the First Degree pursuant to Hawaii Revised Statutes (**HRS**) § 708-
840(1)(b)(i) and/or (b)(ii) (2014) (**Robbery First**).[2]  On

---

[1]  The Honorable Paul B.K. Wong presided.

[2]  HRS § 708-840 provides, in relevant part:

> **§708-840 Robbery in the first degree.**  (1) A
> person commits the offense of robbery in the first
> degree if, in the course of committing theft or
> non-consensual taking of a motor vehicle:
>
> . . .

(continued...)

September 9, 2019, Badiang was sentenced to an indeterminate term of imprisonment of twenty years with credit for time served.

On appeal, Badiang asserts two points of error: (1) the Circuit Court erred in failing to instruct the jury on eyewitness identification; and (2) defense trial counsel failed to provide effective assistance which resulted in a withdrawal and substantial impairment of a potentially meritorious defense. Specifically, Badiang contends his trial counsel failed to provide effective assistance by (a) admitting that Badiang is depicted in Walmart surveillance photographs; (b) failing to object to Plaintiff-Appellee State of Hawaiʻi's (**State**) request to admit into evidence still photographs taken from surveillance videos from Paalaa Kai Bakery, Jack in the Box, and Walmart; and (c) failing to object to Honolulu Police Department (**HPD**) Officer Bryce Kim's (**Officer Kim**) testimony as to what he saw in the Jack in the Box surveillance video.

For the reasons discussed below, we affirm.

## I.  Background

This case arises from an incident which took place in the early morning of April 10, 2017.  Edward Tamayo (**Tamayo**) and Eljoe Agnes (**Agnes**) were employees at Paalaa Kai Bakery in Waialua on the North Shore of Oʻahu.  Agnes and Tamayo were on break at 3:30 a.m., when a female approached and asked them for the time.  After they told her it was 3:30 in the morning, a male "wearing a mask, like a t-shirt" approached them from behind the

---

(...continued)

    (b)   The person is armed with a dangerous instrument or a simulated firearm and:

        (i)   The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance; or

        (ii)  The person threatens the imminent use of force against the person of anyone present with intent to compel acquiescence to the taking of or escaping with the property[.]

female.  Agnes testified some guy came at them and said "don't move[,]" but Agnes could not say from how far away because Agnes was facing Tamayo and the guy approached Agnes from behind.  The masked male then grabbed the back neckline of Agnes' t-shirt, and pointed a gun into Agnes' back.  The female took Agnes' cell phone, vape, and cigarettes, and Tamayo's cell phone and wallet. The female also saw Tamayo's vehicle, had him open it, took Tamayo's car keys, and drove away in the vehicle.  The male walked away from Agnes and Tamayo to the side of the mini-mart adjacent to the Paalaa Kai Bakery and left separately.

On December 27, 2018, Badiang was charged with committing Robbery First against Tamayo and/or Agnes on April 10, 2017, in the City and County of Honolulu.

During opening statements, the State informed the jury that although the male wore a mask at the robbery, there is visual evidence showing Badiang at Walmart after the robbery wearing the same shoes, shorts, and wearing the t-shirt the male robber used as a mask.  During his opening statement, Badiang asserted that this case is about the deal the female robber, Tonygirl Cataluna (**Cataluna or Tonygirl**) made in exchange for her statement and drew the jury's attention to Cataluna's motive in identifying Badiang as the male robber which no one else could corroborate.  Badiang's counsel stated:

> It's all about motive.  It's all about interest.  It's all about looking in the mirror and telling yourself how the heck am I going to get out of this thing?  How the heck will I get out?  It's all about self-preservation.  The evidence will show you there was a deal in place.  She was looking at 20 years.  She got probation.  She was in custody.  As soon as the deal got in place, she was released.

Tamayo testified that the male used what looked like a t-shirt to cover his head and Tamayo could "not really" see the male's eyes.  Tamayo described the male as "skinny."  Tamayo testified that he saw the male walk to the side of the mini-mart after the female drove away in Tamayo's vehicle and heard an engine start but Tamayo did not see the male drive away.

Agnes testified that he was facing Tamayo when the male walked up from behind him so Agnes did not really see the male or the mask.  Agnes also testified the male's body type was similar to his own but described the male as "more taller" and "more skinny."  Agnes testified that he was scared during the robbery because the male had a gun, and that Agnes had four or five seconds to observe the male.

Cataluna testified that she formally met Badiang towards the end of 2016, about four months before the robbery and that Cataluna was with Badiang's cousin the first time they met.  Cataluna also testified she met Badiang four times prior to their fifth meeting on April 10, 2017, and described the prior meetings.  Cataluna stated her fourth meeting with Badiang was about two weeks prior to April 10, 2017.

Cataluna testified that Badiang picked her up in a white truck around midnight going into April 10, 2017, Badiang asked if she wanted to make money, and that she got into Badiang's truck because she was homeless and thought they were going to break into cars to make money.  Cataluna also testified that she and Badiang first went to his grandmother's house where they took a shower, ate, and left about thirty minutes later.  She and Badiang then drove around for about thirty minutes and stopped at a red light a little bit after the bakery on their way back to Wahiawa.  Cataluna testified Badiang turned to her while they were stopped and asked her "if [she] was down."  She asked him what he meant and Badiang said "it's a yes or no question, if [she] was down or no, and [she] told him yes."  Badiang then made a U-turn, did not pull into the bakery parking lot, and instead parked on the side of the building.

Cataluna testified Badiang told her to distract the two guys who were sitting in front of the bakery, that Badiang reached into a backpack behind Cataluna and pulled out a gun, and that it was the first time Cataluna saw a gun.

Cataluna identified Badiang at trial, in the bakery surveillance photograph as the male who had a shirt over his face

as he walked behind her with the gun, in Mililani Jack in the Box drive-through surveillance photographs as the male driving a white truck with Cataluna and a male as passengers, and in Mililani Walmart surveillance photographs as the male leaving with her.

Cataluna testified she was arrested and questioned on April 15, 2017, she was asked if she wanted to make a statement about the robbery, and Cataluna agreed to make a statement. Cataluna also testified she did not want an attorney for the interview because she "was willing to tell them what happened because I don't -- I didn't want to get in trouble for something I didn't know what was going on, meaning the gun." At this interview, no "deals" were offered by the detective and Cataluna did not ask for a deal.

Cataluna further testified that, in June 2017, she met with a public defender, who recommended making a deal. About one year later, on July 5, 2018, Cataluna gave a second statement as part of a Cooperation Agreement she entered into on July 26, 2018, with the prosecuting attorney. In exchange for testifying against Badiang, Cataluna's Robbery First charge would be reduced to Theft in the Second Degree, and she would receive probation and time served in lieu of incarceration.

On cross-examination, Cataluna testified that during the second interview she told the detective that she had known Badiang for "[p]robably a year." Cataluna also testified that when she was arrested, the detectives told her "your partner already told us what happened." Cataluna testified that in the first interview, the detective asked if she had any kind of hate or dislike for Badiang and Cataluna responded "[k]ind of at the moment," and "he putting it all on me[,]" and when the detective in the second interview asked if she was upset with Badiang, Cataluna responded that she "was kind of upset at him."

## II.  Discussion

### A.  The Circuit Court did not err in withdrawing an instruction on eyewitness identification

In his first assertion of error, Badiang argues the Circuit Court erroneously failed to instruct the jury on eyewitness identification because identification was the sole issue at trial.  Badiang contends that without the instruction on eyewitness testimony, set out in Hawaii Criminal Jury Instruction (**HAWJIC**) 3.19 (2014),[3] there is a reasonable probability that the error contributed to Badiang's conviction.  Badiang also asserts

---

[3]  HAWJIC **3.19 Eyewitness Testimony** provides:

> The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.
> You must decide whether an eyewitness gave accurate testimony regarding identification.
> In evaluating identification testimony, you may consider the following factors:
> The opportunity of the witness to observe the person involved in the alleged criminal act;
> The stress, if any, to which the witness was subject at the time of the observation;
> The witness's ability, following the observation, to provide a description of the person;
> The extent to which the defendant fits or does not fit the description of the person previously given by the witness;
> The cross-racial or ethnic nature of the identification;
> The witness's capacity to make an identification;
> Evidence relating to the witness's ability to identify other participants in the alleged criminal act;
> Whether the witness was able to identify the person in a photographic or physical lineup;
> The period of time between the alleged criminal act and the witness's identification;
> Whether the witness had prior contacts with the person;
> The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded;
> Whether the witness's identification is in fact the product of his/her own recollection; and
> Any other evidence relating to the witness's ability to make an identification.

that Defendant's Supplemental Instruction #1 (Identification)[4] should also have been given, but the Circuit Court refused it because the court believed the remaining instructions were adequate.  We conclude the circuit court did not err in its decision not to instruct the jury with HAWJIC 3.19 and Defendant's Supplemental Instruction #1.

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." Stanley v. State, 148 Hawaiʻi 489, 500, 479 P.3d 107, 118 (2021) (emphasis omitted).

> Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

Id. at 500-01, 479 P.3d at 118-19 (citing State v. Holbron, 80 Hawaiʻi 27, 32, 904 P.2d 912, 917 (1995)).

---

[4]  Defendant's Supplemental Instruction #1 states:

DEFENDANT'S SUPPLEMENTAL INSTRUCTION #1
(Identification)

The Defendant has pled "Not Guilty" to the charge against him.  The burden of proving the identity of the person who committed the offenses is upon the State.  The State must prove beyond a reasonable doubt that this defendant is the person who committed the offense.  The defendant has neither the burden nor the duty to show that the offenses, if committed, were committed by someone else, or to prove the identity of that other person.  You must determine, therefore, not only whether the State has proved each and every element of the offenses charged beyond a reasonable doubt, but also whether the State has proved beyond a reasonable doubt that this defendant is the person who committed them.

State v. Cabinatan, 132 Haw. 63, 319 P.3d 1071 (Haw., 2014).

7

Badiang relies on State v. Cabagbag, 127 Hawaiʻi 302, 277 P.3d 1027 (2012), for the Hawaiʻi Supreme Court's holding that:

> (1) in criminal cases, the circuit courts must give the jury a specific eyewitness identification instruction whenever identification evidence is a central issue in the case, and it is requested by the defendant, (2) a circuit court may, in the exercise of its discretion, give the instruction if it believes the instruction is otherwise warranted in a particular case[.]

Id. at 304, 277 P.3d at 1029 (emphases added, footnote omitted). In Cabagbag, the Hawaiʻi Supreme Court considered the challenges associated with unreliable eyewitness identification testimony resulting in misidentification and the concern that "exclusion of 'reliable' eyewitness testimony might result in the 'guilty going free.'"  127 Hawaiʻi at 309-10, 277 P.3d at 1034-35 (quoting Manson v. Brathwaite, 432 U.S. 98, 112 (1977)).  The supreme court referred to researched findings of variables that affect the accuracy and, hence, reliability,[5] of eyewitness identification, such as "passage of time, witness stress, duration of exposure, distance, 'weapon focus' (visual attention eyewitnesses give to a perpetrator's weapon during crime), and cross-race bias (eyewitness more accurate at identifying persons of their own race)."  Id. at 310-11, 277 P.3d at 1035-36 (footnotes omitted).

Badiang's reliance on Cabagbag is misplaced.  Tamayo and Agnes testified they could not identify Badiang as the masked robber.  Therefore, instruction on whether an eyewitness gave accurate testimony regarding identification is unnecessary in this case where identification was not made by an eyewitness. Instead, the only person who identified Badiang as the masked male and in the security photographs was the female robber, Cataluna, who based her identification on their prior acquaintance and her testimony that Badiang picked her up in the

---

[5]  But see Cabagbag, 127 Hawaiʻi at 322, 277 P.3d at 1047 (noting in dissent that "credibility is different from reliability.") (Acoba, J., dissenting in part).

early morning of April 10, 2017, and that after they robbed the men at Paalaa Kai Bakery, they picked up another person, went to the Mililani Jack in the Box drive-through and Mililani Walmart.

Moreover, the reliability of the identification was not Badiang's "sole defense" or "the sole issue" at trial, as urged in the opening brief.  Rather, the primary issue was Cataluna's credibility and motive in identifying Badiang, not the reliability or accuracy of her identification of Badiang.  In its opening statement, the defense declared: "What this case is all about is what we talked about earlier: motive, interest, self-preservation" and, "[t]his is not about who you're going to believe, this is about whether Tonygirl can be believed and whether her statements that she makes is free and clear or with a legit purpose or legitimate purpose."

In Cataluna's cross-examination, Badiang established that when Cataluna was arrested on April 15, 2017, Cataluna was not informed as to what she was being arrested for, and was told "[she] should know what [she] did."  Badiang also established that at some point upon Cataluna's arrest, she was told "your partner already told us what happened[,]" that during her two interviews, Cataluna expressed animus towards Badiang, and told the detective that "[t]he only thing that I'm mad about is that I'm sitting in jail for him, you know what I mean."  The pertinent issue in this case was whether Cataluna was a credible witness given her implication in the incident, and not whether she was a reliable eyewitness in identifying Badiang given the concerns expressed in Cabagbag.

Finally, Badiang does not provide any specific argument regarding the Circuit Court's decision not to instruct the jury with Defendant's Supplemental Instruction #1.  Rather, he argues generally that the jury should have been instructed on Cataluna's ability to identify Badiang because considering the instructions as a whole, "the jury could come to only one conclusion: there is no doubt at all that Cataluna could identify Mr. Badiang in the photos" which "improperly bolstered Cataluna's credibility[,]

9

[a]nd relying on Cataluna's credibility was problematic because her version of the events was disputed by the evidence." To the contrary, we conclude that considering the jury instructions as a whole, the Circuit Court properly instructed the jury, including with regard to its role in assessing the evidence and the credibility of the witnesses.

With regard to the weight of evidence and the credibility of witnesses, the Circuit Court instructed the jury as follows:

> While you must consider all of the evidence in determining the facts in this case, this does not mean that you are bound to give every bit of evidence the same weight. You are the sole and exclusive judges of the effect and value of the evidence and of the credibility of the witnesses.
>
> It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.
>
> Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.

(Emphases added.)

The Circuit Court also instructed:

> If you find that a witness has deliberately testified falsely to any important fact or deliberately exaggerated or suppressed any important fact, then you may reject the testimony of that witness except for those parts which you nevertheless believe to be true.

The Circuit Court gave further instructions regarding the testimony of an alleged accomplice as follows:

> The testimony of an alleged accomplice should be examined and weighed by you with greater care and caution than the testimony of ordinary witnesses. You should decide whether the witness's testimony has been affected by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness stands to receive because of his/her testimony, or by the witness's fear of retaliation from the government.

The jury is presumed to have followed the circuit court's instructions. State v. Cordeiro, 99 Hawaiʻi 390, 413, 56 P.3d 692, 715 (2002).  Badiang's concern that Cataluna's credibility was improperly bolstered was addressed by the Circuit Court's instructions to the jury that the testimony of an alleged accomplice should be examined and weighed with greater care and caution than that of ordinary witnesses.

The jury instruction on the variables addressed in Cabagbag and HAWJIC 3.19 is not applicable to Tamayo and Agnes' inability to identify Badiang, and Cataluna's identification of Badiang in this case instead raised issues about the credibility and motive of an accomplice who had prior dealings with the defendant and was also facing criminal charges.  Further, the Circuit Court properly instructed the jury on its role in assessing the evidence and credibility of witnesses. Accordingly, the Circuit Court did not err in withdrawing HAWJIC 3.19 and not instructing on Defendant's Supplemental Instruction #1.

**B.  Defense counsel did not provide ineffective assistance at trial**

In his second point of error, Badiang asserts that his defense counsel essentially admitted to the jury that Badiang committed the robbery and failed to object to the admission of hearsay and other evidence, thus providing Badiang ineffective assistance at trial.[6]

_____

[6]  We note the State argues that a Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 40 hearing is the proper method to address ineffective assistance

(continued...)

"The standard for determining the adequacy of counsel's representation is whether, when viewed as a whole, the assistance provided is 'within the range of competence demanded of attorneys in criminal cases.'" State v. Salavea, 147 Hawai'i 564, 576, 465 P.3d 1011, 1023 (2020) (quoting Cordeiro, 99 Hawai'i at 405, 56 P.3d at 707).

> First, a defendant must show that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence. [State v. ]Antone, 62 Haw. [346,] 348, 615 P.2d [101,] 104 [(1980)]. Second, the defendant must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. Id. at 348-49, 615 P.2d at 104; State v. DeLeon, 131 Hawai'i 463, 478-79, 319 P.3d 382, 397-98 (2014).

Id.

The second prong is satisfied if the defendant shows a possible impairment of a potentially meritorious defense and the defendant need not show the impairment was probable nor prove that the defendant suffered actual prejudice. Id. (citing DeLeon, 131 Hawai'i at 479, 319 P.3d at 398). "Specific actions or omissions that are alleged to be erroneous but that had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." Id. (citing State v. Pacheco, 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001)). "If, however, the alleged error or omission had no obvious basis for benefitting the case and resulted in the withdrawal or impairment of a potentially meritorious defense, then the assistance of defendant's counsel was constitutionally inadequate." Id. (citing State v. Smith, 68 Haw. 304, 309-11, 712 P.2d 496, 500-01 (1986)).

Badiang contends that defense counsel's first mistake was in admitting that Badiang was the robber and in making

---

[6](...continued)
of counsel claims and because no hearing was conducted, the record is void as to the basis of defense counsel's actions. We disagree as the record is sufficient to address Badiang's argument. See State v. Silva, 75 Haw. 419, 439, 864 P.2d 583, 592 (1993) (refusing to adopt general rule that ineffective assistance of counsel claims cannot be raised for the first time on appeal when there is a sufficiently developed trial record).

irreconcilable arguments in opening and closing statements.  In his opening statements, defense counsel admits to Badiang being in videos taken from Jack in the Box and Walmart, but not to being the robber at the bakery:

> Yes, Jack in the Box <u>you'll see the video that the driver was Mr. -- was Rubin.  He was driving, that was his -- he was driving, there's no dispute to that.</u>  At 4:38 -- 4:18 in the morning, that was him.  Sometime thereafter <u>they go to Wal-Mart and, yes, that is him. The video shows him.</u>  Doesn't lie.  Pictures don't lie.  They may be a different interpretation, but it doesn't lie.  It's there.  It cannot be altered.  It cannot -- it cannot change.

In closing argument, Defense counsel responded to the State's closing argument that the male in the bakery surveillance photographs is the same person at Walmart with Cataluna as follows:

> The issue is not the time as to where Tony Cataluna was. The issue is where was Rubin? <u>Rubin was not in the photographs. That's not Rubin in the photographs.</u> I was going to show it to you, but you know what, I'm not going to, because you'll see it again. You've seen it already. Person is tall and skinny. Not only by Eljoe, Tamayo, the detectives, the officers, person was tall and skinny. Only person who said that person, that unknown person, <u>the only person who said that that's Rubin is Tonygirl</u>.
>
> . . . . We're not disputing that the person at the bakery <u>appears to be</u> the same person at Wal-Mart. When we look at it, although it's very grainy, <u>they appear to be one in the same.</u>
>
> <u>But that's not the issue. The issue is who is that person?</u> What evidence have they presented? <u>What evidence have they presented to say that that is, beyond a reasonable doubt, that that was Rubin? Nothing. The only thing they presented was Tonygirl, Tonygirl said that was Rubin</u>.
>
> . . . .
>
> But they're trying to tell you, <u>the government is trying to tell you</u> look at the robbery photograph, look at the Jack in the Box photograph, and look at the Wal-Mart photograph. <u>Rubin had a white shirt, therefore it has to be him, because that person on the video – the snapshot and the bakery and Wal-Mart, that person had a white shirt</u>.
>
> <u>That person is someone else</u>. It's clear because the only person that tells you who that person is, that guy, Tony Cataluna's friend, the only person that tells you that this person with the hood, with a white shirt, the only person that tells you who this is is Tonygirl.

> At Wal-Mart, you know, I looked at it myself, I think you all did too, the police did too. Everyone here does. Person in Wal-Mart <u>appears to be</u> the same person in the bakery. But that's not the issue. <u>The issue is how does it become -- where is the evidence showing that it's Rubin?</u> It's the source again, and she -- the source simply has too many. <u>She has motive, which is self-interest. She's clearly biased</u> because she was turned in, not by the people -- and that's her bad luck. She wasn't even turned in by the people she robbed, she was turned in by someone else, a friend. She was turned in by Rubin, and she knows it.

(Emphases added.)

Contrary to Badiang's arguments, his trial counsel did not admit that the person in the Jack in the Box and Walmart photos is the robber.  Instead, trial counsel argued the person at the bakery was someone else; that the prosecution is arguing it must be the same person in the robbery photo, the Jack in the Box photo and the Walmart photo because the person in the photos wore a white shirt; but that the only person to actually identify the person at the bakery was Cataluna, who was not credible. Trial counsel maintained throughout his opening and closing arguments that, although Badiang is depicted at Jack in the Box and Walmart, Cataluna's testimony is the only evidence presented by the State tying Badiang to the robbery, and trial counsel continued to direct the jury's attention to Cataluna's motive in identifying Badiang as the male robber.  Therefore, we do not consider trial counsel's arguments irreconcilable.

Badiang contends that his trial counsel's second purported mistake was in failing to object to the admission of still photos of surveillance videos at the bakery, Jack in the Box, and Walmart, where the State had possession of the surveillance videos, in violation of Hawaii Rules of Evidence (**HRE**) Rule 1002 (2016).[7]  However, still photographs of surveillance videos are admissible as duplicates under HRE Rule

---

[7]
> **Rule 1002  Requirement of original**.  To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute.

1003 (2016).[8]  See U.S. v. Perry, 925 F.2d 1077, 1082 (8th Cir. 1991) (holding a still photographic image made from a video recording is a duplicate and thus admissible); see also, State v. Kaoihana, No. CAAP-10-0000042, 2012 WL 171615, at *2 (Haw. App. Jan. 20, 2012) (holding a duplicate of original surveillance video and still photographs therefrom are admissible under HRE Rule 1003).  Furthermore, the State adduced sufficient evidence from its witnesses to support the Circuit Court's finding that the contents therein are what the State claims.  See HRE Rule 901(a), (b)(1), (b)(9) (2016).[9]  Tamayo testified as to the contents of the photographs from the bakery surveillance video; On Ting Wong (**Wong**), an IT technician employed by Blue Pacific Management, which operates all Hawaiʻi Jack in the Boxes, testified as to the photographs from the Mililani Jack in the Box drive-through surveillance system; and Cataluna testified as to

---

[8]

       **Rule 1003  Admissibility of duplicates**.  A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

[9]  HRE Rule 901 provides, in pertinent part:

       **Rule 901  Requirement of authentication or identification**.  (a) General provision.  The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

       (b) Illustrations.  By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

       (1)    Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.

       . . . .

       (9)    Process or system.  Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

the still photographs from the Mililani Walmart.  There is no genuine question raised as to the authenticity of the surveillance videos themselves and Badiang has not shown that it was unfair to admit the photographs as duplicates in lieu of the original videos.  See HRE Rule 1003.

Further, although Badiang contends the entry of these photographs was detrimental to his defense because the time stamps on the photographs were used by the State to corroborate Cataluna's testimony, Badiang's trial counsel sought to use the time stamps to argue Badiang was not with Cataluna and to challenge Cataluna's credibility.  In particular, in closing argument, Badiang's trial counsel argued that photographs from Jack in the Box show Badiang going through the drive through at 4:01 a.m., that the photos do not show a girl in the vehicle with Badiang, and that Cataluna was at Jack in the Box at 4:18 a.m., as reflected on a receipt from Jack in the Box that she testified about.  Badiang's trial counsel thus used the timing on the photos to assert discrepancies that undermine Cataluna's timeline of events.  In the context of an ineffective assistance of counsel claim, "[m]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight."  DeLeon, 131 Hawaiʻi at 479, 319 P.3d at 398 (quoting State v. Richie, 88 Hawaiʻi 19, 39-40, 960 P.2d 1227, 1247-48 (1998)).

Finally, Badiang asserts that his trial counsel's third purported mistake was in failing to object under HRE Rule 1002 to Officer Kim's description of what he saw in the Jack in the Box surveillance video (not the photographs thereof), when the videos were not admitted into evidence by the State, thus rendering Officer Kim's testimony inadmissible hearsay.  Badiang argues that through this inadmissible testimony, the State was able to establish that the white truck Officer Kim observed in the Jack in the box surveillance video was the same white truck Tamayo and

16

Agnes saw near the mini-mart prior to the robbery.[10]  Badiang argues Officer Kim's testimony was then used to corroborate Cataluna's testimony that prior to the robbery, Badiang picked her up in a white truck.

Even if we assume, without deciding, that Badiang's counsel improperly failed to object to Officer Kim's testimony, evidence about the white truck was presented to the jury by other proper means.  The still photographs from the surveillance video at Jack in the Box were subsequently entered into evidence during the State's direct examination of Wong, showing a white pickup truck at a drive-through.  Cataluna also testified about the images from the Jack in the Box drive-through.  Thus, Badiang's challenge regarding his trial counsel's lack of objection to Officer Kim's testimony does not demonstrate the possible withdrawal or substantial impairment of a potentially meritorious defense.

We thus conclude that, viewed as a whole, Badiang's trial counsel did not provide ineffective assistance at trial.

### III.  Conclusion

Based on the foregoing, we affirm the Judgment of Conviction and Sentence entered on September 9, 2019, by the Circuit Court of the First Circuit.

DATED:  Honolulu, Hawaiʻi, June 27, 2022.

On the briefs:

Megan K. Kau,
Jessica A. Szemkow,
for Defendant-Appellant

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge

---

[10]  Tamayo testified that while he and Agnes were eating in front of the bakery, a white pickup truck arrived at the mini-mart, and Agnes testified he saw a white truck parked by the mini-mart prior to the female walking up to them.